Madden, Judge,
delivered the opinion of the court:
The plaintiffs, Peter Kiewit Sons’ Co. and Morriison-Knudsen Company, Inc., were partners in a joint venture to perform a construction contract made with the United States. The plaintiffs sue for damages alleged to have been suffered by reason of the increased costs of performance of the contract which were due to delays claimed to have been caused by the Government’s breach of the contract.
On or about the 28th of March 1947, the plaintiffs and the Government, acting through the Bureau of Reclamation, Department of the Interior, entered into a standard form Government contract. Under this contract the plaintiffs were to construct earthwork and structures for the Estes and Marys Lake power plants, the parking area adjacent thereto, the gatehouse, spillways, and penstock connected to the power plants. The Estes and Marys Lake power plants were part of a much larger project known as the Colorado-Big Thompson Project, which is an extensive hydroelectric and irrigation project located on the east and west slopes of the Continental Divide in the state of Colorado. Other parts of the overall Colorado-Big Thompson Project were constructed by different contractors under separate contracts with the Government.
The work to be performed by the plaintiffs was covered in Schedules I, II, and III of the specifications accompanying the contract. Schedule I covered the Estes power plant, switchyard, and parking area; Schedule II the Marys Lake power plant with its switchyard and parking area; and Schedule III the spillway for Marys Lake, the penstock gate structure and penstock for both Estes and Marys Lake. Plaintiffs submitted separate bids for Schedules I, II, and III, but stated on the last page of the bids that if the Government accepted and awarded them contracts for all three of the schedules, then they could deduct from the total contract price the sum of $238,000. The Government accepted plaintiffs’ bid on the combined three schedules for the total contract price of $2,176,708, which took account of the $238,- *670 000 reduction from the separate bids by the plaintiffs on the three schedules. This amount, together with additional sums for extras and changes not here in issue, has been paid to the plaintiffs.
The contract provided that the work should be completed within 900 calendar days after the Government gave notice to proceed. This notice was given to the plaintiffs on May 3,1947, and called for completion of the contract by October 19, 1949. Under the terms of the contract the plaintiffs were to supply all labor and equipment and some of the material, and the Government was to furnish the steel penstock for both plants, steel and iron pipes and fittings, electrical conduits, metal sash windows, and plumbing fixtures. The contract was extended several times by the Government. Completion dates as finally fixed by the Government, and met by the plaintiffs, were:
Schedule I. October 18,1950
Schedule II. September 18,1950
Schedule III. September 30, 1950
The plaintiffs sue for $261,792.72 which they allege is the increased cost resulting from delays in the performance of the contract, which delays are claimed to have been occasioned by breaches of contract by the Government. Plaintiffs’ claim is broken down into two separate categories: Penstock and General and Concrete.

Penstock

Under Schedule III of plaintiffs’ contract, they were to construct a gatehouse at the lower terminal of the Earns Horn Tunnel. Earns Horn Tunnel carried water to the eastern slope of the Continental Divide and was to provide the necessary water for the Marys Lake power plant. From the gatehouse, which regulated the flow of water from the Earns Horn Tunnel, a single 96-inch diameter penstock was to be installed to carry the water to the Marys Lake power plant, a distance of 482 feet. Penstock is a tubular steel conduit. The schedule also provided for the construction of a gatehouse at the lower terminal of another tunnel, Prospect Mountain, to regulate the flow of water *671 into the Estes power plant. Three parallel lines of pen-stock, each 78 inches in diameter, were provided to carry •the water a distance of 3,941 feet from the gatehouse to the Estes power plant. The penstock was delivered to the sites in various lengths to fit specified areas of installation. The Marys Lake penstock consisted of 18 sections, and the Estes penstock 432 sections which were to be installed in three lines of 144 sections each.
The plaintiffs’ original plan of construction provided for the installation of the penstock during the period from approximately May 1, 1948 to October 31, 1948. A revised schedule for the installation of the penstock was prepared and submitted to the defendant about March 18, 1948, and called for completion of the penstock installation by December 1, 1948. However, actual delivery by the Government of penstock to the sites did not start until May 26, 1948, and the final delivery was not received until August 20, 1949. Installation was started by the plaintiffs August 1, 1948, and was completed about September 17, 1949. The plaintiffs claim damages for this delay.
In anticipation of its needs in supplying the penstock for the Marys Lake and Estes power plant projects, the defendant solicited bids for the fabrication of the required pen-stock. The bids called for opening on June 24, 1946, which was some nine months before the plaintiffs’ contract was entered into. The bid of the Darby Corporation of Kansas City, Kansas, hereinafter called Darby, was low. Darby notified the Bureau of Declamation that delivery of the required penstock could be made within 450 days from the time that notice to proceed was given. An inspector of the defendant reported that Darby could meet the requirements for the supply of the needed penstock and could arrange for its deliveries to agree with the schedule of the general contractor. On October 25,1946, the defendant wrote to Darby notifying it of the award of the contract to it and stating that the performance period would commence with the receipt of the award. Darby received the notice October 28, 1946. The Darby contract provided for the completion of the 96-inch penstock section for the Marys Lake power plant within 360 days from the receipt of the award and the completion *672 of the 78-inch penstock sections for the Estes project within 720 days. Thus the completion dates for the fabrication of the penstock were October 23, 1947 for Marys Lake, and October 17, 1948 for Estes. Darby completed the Marys Lake penstock by June 30, 1948, and delivered it to the site in July of that year. It completed the Estes penstock about August 13,1949, with final delivery to the site by August 20, 1949. Much of the delay in the delivery of the penstock was caused by the shortage of steel and the difficulty that Darby was having in finding and maintaining a source of supply of the plate steel needed for the manufacture of the pen-stock. This difficulty began sometime before the award of the plaintiffs’ contract in March 1947.
Eecognizing the difficulty that Darby was encountering, the Government attempted to secure priorities assistance for Darby so that manufacture of the penstock could begin on schedule. The contracting officer for the Darby contract determined that the delay in completing the 96-inch penstock for the Marys Lake power plant resulted from causes within the control of Darby, since it had received the steel for this penstock in August and September of 1947, but had used it in fabricating penstock under another contract with the Government which was let after the Marys Lake and Estes contract, but called for an earlier delivery date. He also found that 34 percent of the steel required for the Estes pen-stock was available in March 1948, but that commencement of its manufacture was delayed until April due to the other penstock contract with the Government. The contracting officer further found that production of penstock was delayed a total of 205 days between the period April 1948 and April 1949, due to excusable delays caused by the shortage of steel.
The plaintiffs were not advised of the delays in the manufacture of penstock as soon as the Government knew of them and not until November 1948 were they advised that their revised installation schedule could not be met.
The Government kept an inspector on duty at the Darby plant to see that the penstock for the Marys Lake and Estes projects conformed to specifications and to speed up operations wherever possible. As Darby fell behind, the Government attempted to assist it in obtaining the necessary steel *673 and on February 16, 1949, the Secretary of the Interior requested the Secretary of Commerce to assist in getting the approval of an allocation of steel for the Bureau of Reclamation’s projects which included the Marys Lake and Estes power plants. At this time P. L. 395, 80th Congress, 1st Session, 61 Stat. 945, was in effect. It was a law whereby a voluntary allocation plan was set up by industries dealing with scarce commodities, steel among others. The Steel Products Advisory Committee was established under this law and allotted quantities of steel for distribution to users when, in the judgment of the Committee, it would tend to stabilize the national economy in areas of production where there was a critical shortage as an aftermath of World War II. This law was passed on December 30,1947, but in the early period of its existence applications were not made to the Steel Products Advisory Committee by the Government on an agency basis. It was not until the Department of the Interior made its application for steel for the Bureau of Reclamation projects in 1949 that an agency of the Government had applied for an allocation on such a basis. It is not shown that had such an application been made before this time it would have been accepted and acted upon favorably by the Advisory Committee. As a result of the application in 1949, steel was made available to Darby for use in fabrication of the penstock needed by the plaintiffs.
On February 1, 1950, the contracting officer for the plaintiffs’ contract issued his findings of fact with respect to the delays caused by the penstock and other items of work. He determined that the plaintiffs were prepared to install pen-stock by May 1,1948, as planned, and except for the rate and order of delivery, the plaintiffs would have completed installation by January 31,1949. He granted an extension of time of 226 days under Schedule III of the contract. This extension was granted on the ground that another contractor had not completed construction of the Prospect Mountain Tunnel, and therefore the plaintiffs could not construct the Estes gatehouse until the tunnel was completed. Since the construction of the gatehouse and the penstock all came under Schedule III, the contracting officer did not allow any extension of time specifically for delay in the delivery of penstock, *674 because the installation of the penstock could be performed concurrently with and independently of the gatehouse structures. The plaintiffs did not object to these findings since the time extension under all of Schedule III was sufficient for them to install the penstock without having liquidated damages assessed against them for late completion. We have found that the plaintiffs were delayed approximately eight months in the installation of penstock at an increased cost to the plaintiffs of $21,560.50.
The plaintiffs claim that the failure of the Government to deliver the penstock as needed by them for the orderly and economical prosecution of their work was a breach of contract. In support of this contention, the plaintiffs point out that the Government knew at the time it entered into its contract with the plaintiffs that the supplier of the penstock was having trouble in obtaining plate steel, and that after entering into its contract with the plaintiffs, the Government contracted with the same supplier of penstock, Darby, for other penstock, which contract called for an earlier delivery date. The plaintiffs also say that the Government did not fulfil its contractual obligations by doing everything that was possible to supply the required penstock, since it was not until a year and a half after the passage of P. L. 395 that it requested an allocation of steel for the reclamation projects.
Generally the Government is not liable for delays in making the work or material available to a contractor, United States v. Rice, 317 U. S. 61; United States v. Foley Co., 329 U. S. 64. However, where the Government or its authorized representatives are guilty of some act of negligence or willful misconduct which delays the contractor’s performance, the Government is liable for the resulting damages, Chalender v. United States, 127 C. Cls. 557. This is so because there is in every Government contract, as in all contracts, an implied obligation on the part of the Government not to willfully or negligently interfere with the contractor in the performance of his contract, Chalender, supra; Fuller v. United States, 108 C. Cls. 70. When the contract does not specify particular dates upon which delivery of the material is to be made, the implied obligation just referred to is an obligation not to willfully or negligently fail to furnish the materials in time *675 to be installed in tbe ordinary and economical course of the performance of the contract, Walsh v. United States, 121 C. Cls. 546; Thompson v. United States, 130 C. Cls. 1; Chalender, supra. If the Government exerts every effort to supply the contractor with the necessary materials on time, it cannot be held that it has willfully or negligently interfered with performance, Otis Williams & Co., v. United States, 120 C. Cls. 249; W. E. Barling v. United States, 126 C. Cls. 34.
We think that the Government acted without proper and adequate consideration for the interests of the plaintiffs in regard to the penstock. When it gave the plaintiffs notice to proceed, which is a notice to get the equipment and the men on the job for the efficient performance of the work, it knew that Darby was having difficulties getting the necessary raw materials, and it had no right to surmise, at the plaintiffs’ expense, that the situation would improve in time for Darby to meet its schedule of deliveries. The Government’s further conduct, in placing another contract for pen-stock with Darby, and giving it priority in delivery over the contract on which the plaintiffs depended, was inexcusable, It could be justified only upon the assumption that the Government may, with impunity, do whatever is good for its own interests, regardless of the harm which may result to individuals. The Government breached the implied obligation described above, and the plaintiffs were damaged thereby in the amount of $21,560.50. They are entitled to that sum on the penstock claim.

General and Oonorete

The plaintiffs claim $220,126.79 as increased costs in overhead and general expense and the increased costs of pouring concrete, caused by the delays of the Government in delivering materials, other than penstock, and drawings necessary for the performance of the contract.
Under the contract the defendant, was required to furnish all materials intended to be installed in concrete structures, other than reinforcing bars. This consisted primarily of iron and steel pipes, pipe fittings, electrical conduits and metal sealing strips. The placement of the concrete could not be done until this material, together with drawings show *676 ing exactly where the material was to be placed, were furnished the plaintiffs. The defendant’s contracting officer found that the plaintiffs were delayed 214 days on the Marys Lake power plant and 184 days on the Estes switchyard, in addition to 60 days allowed for changes ordered by the contracting officer. The time thus allowed, plus 86 days for an ironworkers’ strike and 34 days for a strike by laborers, was adequate to avoid the assessment of liquidated damages against the plaintiff.
The plaintiffs claim that the delays, other than those caused by the strikes and authorized changes, were caused by the defendant and amount to a breach of its contract for which plaintiffs have the legal right to recover damages in the amount of the excess cost caused by the delays. The Government on the other hand contends that its delays in furnishing materials and drawings were not, in the circumstances, breaches of contract, and that the plaintiffs were entitled only to extensions of time because of the delays.
In April of 1947, the plaintiffs submitted their proposed construction schedule with respect to the work to be performed under Schedules I, II, and III of the contract. Schedules I and II included the work for which the plaintiffs claim the additional costs for general overhead and concrete. Under the construction program for Schedules I and II, it was proposed that the period needed for completion of the Estes power plant, switchyard and parking area would be from May 1,1947 to August 15,1949, and for Marys Lake from September 1, 1947 to July 1, 1949. Plaintiffs’ letter transmitting the above construction program stated in part:
* * * In order to comply with the above schedule, the building and reinforcing details will be required at an early date, this would also require an early delivery of items to be installed in, or below these structures, such as, drainage pipes, electrical conduits and other miscellaneous embedded materials.
Plaintiffs’ proposed construction program was acknowledged by the construction engineer for the Government by a letter of June 20, 1947, which stated that it “appears in general to be possible of accomplishment”. Thereafter the *677 plaintiffs submitted five separate revised construction programs calling for later completion dates.
It was not customary in the Bureau of fteclamation to order materials, other than those requiring special design, such as penstock, turbines and generators, in advance of the award of a contract such as the one with the plaintiffs. Therefore, no efforts were made to obtain the necessary materials for the plaintiffs’ contract until about April 1947. However, at the time that the award was made to the plaintiffs, materials of the type here involved were in short supply and hard to obtain, and the Government experienced great difficulty in getting the needed material under its normal procurement methods, and it was obliged to resort to other means. Awards were made to higher bidders because of better delivery dates. Local warehouses were checked for available materials that could be used as substitutes, and some substitutions were made necessitating changes in drawings. In some instances duplicate orders were placed with different suppliers, and the first delivered was accepted and used.
The other item contributing to the overall delay in plaintiffs’ performance was the failure to receive detail drawings as they were needed in order to proceed with concrete pourings. The defendant’s contracting officer did not consider delays due to the late delivery of drawings, when he allowed extensions of time for the performance of this contract. However, we have found that at least fifty percent of the delays herein involved were caused by the failure to receive the drawings and that this disrupted plaintiffs’ plan of construction and the normal sequence of installing embedded materials and the placing of concrete. We have found that plaintiffs’ increased costs attributable to delays on the part of the Government for its General and Concrete claim amount to $116,059.50. The question, therefore, is whether or not the Government’s failure to deliver the items called for under the contract at the time they were needed was a breach of contract.
In order to determine this question we must look, as in the case of the penstock claim, to the acts of the Government *678 and its agents. We do not think that the Government’s failure to supply the plaintiffs with the materials needed for embedding is, under the facts in this case, a breach of the contract. The Government did everything possible to supply the plaintiffs with the materials in light of the short supply available on the market. We do not think there was negligence by the Government in failing to procure the materials in advance of the notice to proceed, because under its normal procurement system such materials would have been available in time for the contractor to proceed with the orderly and timely performance called for under the contract. By this, we do not mean to imply that there would never be circumstances amounting to a breach of contract where the Government followed what it terms as its “normal” procurement methods, but only that under the facts as presented herein no such breach is shown.
The claim involving the embedded materials is quite distinguishable from the penstock claim. As previously pointed out, the Government was well aware that penstock would not be available at the time it ordered the plaintiffs to proceed and actually committed acts which increased the delay in the delivery of penstock. No such acts are shown with respect to the embedded materials. The claim insofar as it concerns the embedded materials falls within our decision in the Barling case, supra, and plaintiffs cannot recover for delays attributable thereto.
In regard to the delays caused by the Government’s failure -plaintiffs with detail drawings as needed, we at the failure was an act of omission which was a >f contract for which plaintiffs may recover their \ damages.- There is nothing in the record to show why these ^drawings should not have been prepared and delivered on■ time. It is true that some 2500 detail drawings were in- / volved, but when plaintiffs were given notice to proceed by the Government, they had every right to expect timely delivery of the drawings in order to enable them to perform as required, and the Government’s failure is a breach for which damages can be awarded. The mere volume of work i involved is not an adequate reason for excusing the Gov- | ernment from liability for its failure.
*679 It is impossible to determine exactly the amount of delays directly attributable to the Government’s failure to supply these drawings, but we have found that at least fifty percent of all delays included in the General and Concrete claims were caused by the delay in furnishing the drawings. The inability to directly assign an item of cost or extra expense to a breach is no bar to recovery, Chalender, supra, and we will allow plaintiffs to recover fifty percent of the amount of damages found to be attributable to the Government’s delays involved in the General and Concrete claims. Plaintiffs are therefore entitled to recover on account of late delivery of drawings the sum of $58,029.75.
Judgment will be entered for the plaintiffs in the total amount of $79,590.25.
It is so ordered.
Laramore, Judge; Whitaser, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Peter Kiewit Sons’ Company, is, and was at all times material to this case, a Nebraska corporation with its principal place of business in Omaha, Nebraska. Plaintiff, Morrison-Knudsen Company, Inc. is, and was at all times material to this case, a Delaware corporation with its principal place of business in Boise, Idaho. Both plaintiffs are, and have been for many years, general contractors engaged in the construction business.
2. Plaintiffs, as equal partners in a joint venture, entered into a contract on or about March 28, 1947, with defendant, acting through the Bureau of Reclamation, Department of the Interior. The contract was a standard form Government contract and was designated No. 12r-17443. Article 9 provided for delays and damages as follows:
If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work *680 within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event it will be impossible to determine the actual damages for the delay and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing *681 the work shall be final and conclusive on the parties hereto.
The contract further provided that the plaintiffs should furnish some of the materials and perform all of the work in the construction of earthwork and structures in the State of Colorado for the Estes power plant, the switchyard and parking area adjacent thereto, and the gatehouse and pen-stock connected therewith, and also in the construction of earthwork and structures for the Marys Lake power plant, the switchyard and parking area adjacent thereto, and the gatehouse, penstock, and spillways connected therewith. These two power plants were part of a much larger project known as the Colorado-Big Thompson Project.
3. The Colorado-Big Thompson Project is an extensive hydroelectric and irrigation project of defendant in Colorado on the east and west slopes of the Continental Divide. The waters of the Colorado Biver on the western slope of the Continental Divide were more than enough to provide for the generation of electricity and for irrigation purposes, while the eastern slope lacked sufficient water for electrical energy and for irrigation purposes in a seasonally arid section. It was found that by accumulating the excess water from the western slope in reservoirs, pumping it to storage basins at higher levels, then carrying it under the Continental Divide and passing it through hydroelectric plants to be erected at successively lower levels on the eastern slope, a great amount of electrical energy could be generated. After the lowest levels were reached, the water could be run off into storage reservoirs and then distributed to irrigation companies and farmers in the area.
This extensive project has been in the process of construction for a number of years. The waters of the Colorado, after being raised to higher levels on the western slope, are now carried under the Continental Divide through the Alva B. Adams Tunnel. They then pass through the Aspen Creek siphon, located at the eastern end of the tunnel, and through the Bams Horn Tunnel to the eastern slope of the Continental Divide. At the eastern end of the Bams Horn Tunnel, the Marys Lake gatehouse and, below the gatehouse *682 at a much lower level, the Marys Lake power plant, switch-yard and parking area have been built by the plaintiffs. The Marys Lake gatehouse and power plant are connected by a single penstock, a large steel pipe, through which the water passes to the turbines and generators in the Marys Lake power plant. From the Marys Lake power plant the water runs off into Marys Lake and then into what has been designated as the Prospect Mountain conduit. It is then carried under a high point of the range through the Prospect Mountain Tunnel. At the eastern end of the Prospect Mountain Tunnel, the Estes gatehouse has been erected by plaintiffs and, below it at a much lower level, the Estes power plant, switchyard and parking area. The Estes gatehouse and power plant are connected by three penstocks through which the water passes to the turbines and generators in the Estes power plant. After the water leaves the Estes power plant, it is dropped in successive stages to other power plants at lower levels on the eastern slope and finally to storage basins or reservoirs from which it is available for irrigation.
Parts of this overall project, other than those covered by this contract, were constructed by other independent contractors under separate contracts with the defendant. The Earns Horn Tunnel was constructed by another contractor and had to be constructed before the Marys Lake gatehouse could be completed and joined to it at its eastern outlet. The Prospect Mountain Tunnel was constructed by another independent contractor and had to be constructed before the Estes gatehouse could be completed and joined to it at its eastern outlet. The switchyards referred to in the contract and specifications are open areas where electrical transformers and switches were erected. The parking areas referred to in the contract and specifications are open areas adjacent to the power plants for the parking of motor vehicles.
4. The work to be done by plaintiffs under this contract was covered by Schedules I, II and III in Specification 1570.
Schedule I covers the Estes power plant, switchyard, and parking area.
Schedule II covers the Marys Lake power plant, switch-yard, and parking area.
*683 Schedule III covers the Marys Lake penstock gate structure, penstock and spillway. This schedule also covers the Estes penstock gate structure and penstock.
The other two schedules in Specification 1570 are not covered by this contract. Schedule IV covers the Aspen Creek siphon and Schedule V covers the construction of two dikes at Marys Lake and the Prospect Mountain conduit. The work covered by those schedules, as well as other work included in the overall Colorado-Big Thompson Project, was performed pursuant to contracts awarded to other contractors.[1]
5. Plaintiffs put in bids for Schedules I, II, and III in separate amounts and added to the closing page thereof the following voluntary statement:
If awarded Schedules I, II and III, deduct from the total the sum of $238,000.
6. Plaintiffs were notified that they were the lowest bidder and that their bid for Schedules I, II and III was accepted in the amount of the total of the three schedules, namely, $2,414,708.00 less the $238,000.00 deduction, or $2,176,708.00. Plaintiffs state that they made the deduction of $238,000.00 in their bid because there would be certain economies in their operations and in their direct and indirect costs if they were awarded a contract to do the work on all three schedules.
The contract for the work and materials covered by Schedules I, II and III of Specification 1570 was signed on or about March 28, 1947, and called for the payment to plaintiffs of the total sum of $2,176,708.00. Plaintiffs have been paid the $2,176,708.00 called for by the contract, plus additional sums for extras and changes not in issue here. Plaintiffs received in all $2,660,982.97 for their work, as shown by the following tabulation:
*684 Schedule of Payments to Plaintiffs
Original contract price_$2,176,708. 00 Payments made to plaintiffs as shown by final payment voucher estimate #44 dated 6/15/51:
Schedule No. I_$1,110,895.93
Schedule No. II_ 347,357.53
Schedule No. Ill_ 1,253, 678. 77
Extra work Orders 1, 2, and 3_ 14,300.15
Orders for Changes 1 through 6_ 78,001.46
Escalator payments (on wage increases)_ 107,898.57
Gross Earnings_ 2,912,132.41

Deductions:

Materials_ $6,958.37
Electrical energy_ 6,191.07
Reduction unit bid- 238,000.00 251,149.44
Total revenue from Government on contract_ 2, 660,982.97
The contract in suit did not cover finishing the inside of the power plants and other structures, installing finished floors and walls, erecting partitions, or installing turbines, generators and other electrical equipment in the power plants, gatehouses and switchyards.
The specifications indicated, however, that the Government planned to begin installation of power generating equipment before all of plaintiffs’ work was completed and provided that “The contractor shall plan the sequence of his operations so as to permit the installation of the equipment as soon as practicable.”
7. The contract provided that the work should be completed within 900 calendar days after notice to proceed. Notice to proceed was given plaintiffs on May 3,1947. This called for completion of the contract by October 19, 1949.
8. In preparing their bid the plaintiffs based their price on prior performance experience. Plaintiffs had previously performed work in the area of the proposed construction and were familiar with weather conditions normally experienced in that locality. They did not contemplate any outside work during the winter season. They considered the 900 calendar days specified in the contract as adequate to perform the work involved without working during the win *685 ter season, i.e. January through March, but made no allowance for strikes or other labor trouble. Prior to bidding the plaintiffs were not advised of any anticipated delays on the part of the Government in the delivery of materials or the furnishing of drawings for the detailed plans of construction.
9. The plaintiffs supplied all labor and equipment, and furnished the material specified in paragraph 68 of the specifications. The principal materials furnished by plaintiffs included cement for concrete, mortar and grout, reinforcing bars and anchor bars, sand, gravel and bituminous materials for surfacing the roadway, switchyard and parking areas, and “all materials not a part of the completed construction work required for the completion of the contract”.
The Government furnished materials specified in paragraph 67 for delivery in accordance with paragraph 28 of the specifications. It included sand and coarse aggregate for concrete, sand for mortar and grout, all piping, conduits “and all other materials not specifically mentioned in this paragraph or paragraph 68 that will become a part of the completed construction work”. The principal items requiring timely delivery for the proper performance of the plaintiffs’ work consisted of the following:
1. Steel penstock for both plants.
2. Steel and iron pipes, pipe fittings and sealing strips for both plants (Embedded).
3. Electrical conduits for both plants (Embedded).
4. Metal sash windows, plumbing fixtures, appurtenant hardware and other incidental materials.
There is no provision in the contract specifying the order or time of delivery for material to be furnished by the Government.
10. The work on the three schedules was finally completed on the dates shown by the following tabulation:

*686 The following extensions of time were allowed by tbe defendant through issuance of change orders to cover extra work and changes in the work, and also to cover all delays, some of which were concurrent, as shown by the following tabulation:

No liquidated damages were assessed against plaintiffs.
11. Plaintiffs’ claim for damages is set up in the petition under three headings as follows:
*687 Penstock Claim
(Plaintiffs’ Petition, Exhibit A)_ $41,665.93
General Claim
(Plaintiffs’ Petition, Exhibit B)_ 120,230.61
Concrete Claim
(Plaintiffs’ Petition, Exhibit C)_ 99,896.18
Total_ 261, 792. 72
The losses which plaintiffs allege they suffered, and for which they state defendant is liable, are predicated in the main on three causes as follows:
1. Late delivery of penstock to be supplied by defendant.
2. Late delivery of embedded pipes and conduits, pipe fittings, and sealing strips to be supplied by defendant.
3. Late delivery of detail drawings to be supplied by defendant.

Penstock

12. Schedule III of plaintiffs’ contract provided for the construction of a gatehouse at the lower terminal of the Rams Horn Tunnel bo regulate the flow of water through a pen-stock to Marys Lake power plant. A single line 96-inch tubular conduit, connecting with the gate structure at approximate station 845.80, was provided to carry the water to the power plant at approximate station 850.62, a distance of 482 feet, and is known as Marys Lake power plant penstock.
This schedule also provided for the construction of a gatehouse at the lower terminal of Prospect Mountain Tunnel to regulate the flow of water through penstock to the Estes power plant. Three parallel lines of tubular conduits, each 78 inches in diameter, were provided to carry the water from the gate structure at approximate station 989.85 to the power plant at approximate station 1,029.26, a distance of 8,941 feet, and were known as Estes power plant penstocks.
The Marys Lake penstock had a drop in elevation from the gate structure to the power plant of approximately 200 feet, or about 4.5 inches per foot. It was fabricated from plate steel about %th of an inch thick for the upper section with gradations to about %th of an inch thick for the lower section to withstand the hydrostatic pressures along the entire line.
The Estes penstock had a drop of approximately 500 feet from the gate structure to the power plant, with gradations *688 in thickness from %th inch to l%th inches where the lower sections entered the power house and connected with the turbine.
13. Penstock was delivered to the site in various lengths to fit specified areas of installation. They were made up in multiples of 8-foot lengths to a maximum of 40 feet, and generally came in sections of about 32 feet, except the closing sections which had to be cut and made up in the field for installation immediately downstream from each anchored section. These were about 7.5 feet long.
The Marys Lake penstock was made up of 18 sections which were installed largely above ground and supported on seven concrete piers fashioned as cradles, except that three of the lower sections were completely encased in concrete. An expansion joint was provided about the middle of the exposed length.
The Estes penstock was made up from 144 pieces or sections in each line, numbered 1 to 144 from the gate structure to the power plant. The upper portions of the penstock containing sections 1 to 23 were installed above ground for approximately 600 feet, and were supported on concrete piers of maximum spans of 60 feet, with two sets of the sections anchored in concrete. The penstock in this exposed area was provided with two expansion joints. Sections 24 to 144 were installed in trenches and backfilled. There were 11 bends in each penstock line from sections 23 to 130 which required concrete anchors, and 8 sets of the sections immediately below were completely encased in concrete.
14. Marys Lake penstock required 18 pieces between the gate structure and the power plant, with a 19th piece that passed through the power plant for connection with the turbine. Estes penstock required 432 pieces, in three lines of 144 each.
The installation required that the sections of pipe be placed on concrete piers with temporary supports and adjusted ■to accurate alignment and spacing. The girth joints were then welded by the electric-arc method. Anchored sections and those completely encased in concrete had to be installed first. Paragraph 127 of the specifications provided that “All sections of pipe to be buried underground but not em *689 bedded, in concrete shall be assembled progressively from the concrete anchors towards the closing sections shown on the drawings. * * * After backfilling for all bnt the closing sections has been completed, and the pipe temperatures have stabilized, the contractor shall determine the exact length of each closing section of pipe, shall cut such pipe to the required lengths and prepare the field cut edges for welding, shall weld the closing sections in place, and shall complete the backfilling of the pipe trenches adjacent to the closing sections.” Thus the closing sections could not be installed until the underground lengths between anchored sections had been stabilized by ground temperatures. The exposed portions which were subject to temperature changes were provided with expansion joints.
All sections of piping were provided with a shop coat of red-lead primer on the outside and coal-tar enamel inside, to within approximately 9 inches of the welded girth joints. The contractor was required to finish painting the welded ends, and apply one hot coat of coal-tar enamel on the inside and two coats of aluminum paint on the outside for all portions above ground.
The underground sections required a mortar coating reinforced with a wire mesh, but not closer than nine inches to the required field welds until after such welds and the operations incident thereto had been completed.
All girth joints welded in the field had to be radiographed, and any voids or other defects found were to be repaired and approved by the contracting officer.
The weight of piping varied according to size from approximately four to eight tons, and those sections with a mortar coating for underground installation were increased by approximately four tons in weight. A special No. 95 Northwest crane was employed to handle these heavier mortar coated pieces.
15. The plaintiffs’ original plan of construction provided for the installation of the penstock during the period from approximately May 1, 1948 to October 31, 1948. The lower ends of the penstock were embedded and passed through the walls of the substructures of the power plants and the upper ends were embedded in the gate structures.
*690 A revised schedule for the installation of the penstock was prepared and submitted to the defendant about March 18,1948. This plan proposed to complete penstock installation by December 1, 1948. The details of this schedule anticipated delivery of pipe sections for Marys Lake penstock during the period April 1 to 15, 1948, and installation July 1 to 31, 1948. The anticipated delivery of pipe sections for Estes penstock was from April 15 to November 15,1948, and proposed installation from July 16 to November 18,1948.
The actual delivery of penstock to the site started May 26, 1948, and the final delivery was received August 20, 1949. Installation of the penstock was commenced August 1,1948, and was completed about September 17, 1949, with the exception of about 30 closing sections which required special cutting in the field so they would fit the spaces below anchor sections. All welding was completed on or about December 17, 1949.
16. In anticipation of its needs in supplying penstock for the Marys Lake and Estes power plants, the defendant solicited bids for opening June 24,1946. The Darby Corporation of Kansas City, Kansas, sometimes referred to hereinafter as Darby, was the low bidder.
By letter of July 3,1946, Darby wrote the Bureau of Reclamation that delivery could be made within 450 days after the receipt of notice to proceed, because of unobli-gated capacity and unobligated tonnage of steel placed with mills that could be switched to penstock, and that deliveries could begin in the last quarter of the year. On July 12, 1946, Inspector W. II. Strange reported to the Chief Engineer of the Bureau of Reclamation that Darby’s facilities were adequate, that most of its equipment was comparatively new, that it had access to sources of material, that Darby could arrange deliveries to agree with the schedule which would be followed by the general contractor, and from the record of its past performance could complete delivery within the desired 450 days.
On October 25, 1946, the defendant wrote Darby, advising of the award of the contract to manufacture and deliver the welded steel-plate penstock for Marys Lake and Estes *691 power plants, stating the performance period would start upon the receipt of the award.
17. Darby received the notice of award October 28, 1946. Its contract provided for the completion of the 96-inch pen-stock sections for Marys Lake power plant within 360 days from the receipt of the award, and the completion of the 78-inch penstock sections for the Estes power plant within 720 days from the receipt of the award. Thus the completion date for the Marys Lake penstock was October 23,1947, and the completion date for the Estes penstock was October 17, 1948.
Darby completed Marys Lake penstock by June 30, 1948, and it was delivered to the site in July 1948. The Estes penstock was completed about August 13, 1949, with final delivery by August 20, 1949. Thus Darby’s delay in fabrication was 251 calendar days for the Marys Lake penstock and 300 days in completing the Estes penstock.
The Darby Corporation experienced great difficulty in obtaining the necessary plate steel needed for fabricating penstock. This difficulty commenced sometime before the award of plaintiffs’ contract on March 28,1947, and was occasioned by a steel shortage. The steel shortage, which continued throughout 1946,1947,1948 and 1949, was due in part to the steel strike of January and February 1946, the coal strikes of June 23 to July 11,1947 and March 15 to April 26, 1948, and the operation of Public Law 395, approved December 30,1947.
On February 18,1947, the Carnegie Steel Company, which had been a prior source of supply for the Darby Corporation, returned an order for 3,000 tons of steel because of prior obligations. Recognizing the difficulty Darby was having in procuring the necessary steel to fabricate penstock, the Commissioner of Reclamation addressed a communication to the Civilian Production Administration stating that Darby must secure priorities assistance in obtaining the necessary steel in order that fabrication of penstock could begin on time to meet the installation schedule of the Marys Lake and Estes projects.
After the award of the contract to plaintiffs, the Bureau of Reclamation awarded another contract to Darby calling *692 for tbe fabrication of penstocks for tbe Kortes power plant project. Tbe Darby contract for tbe Kortes penstocks called for earlier delivery than tbe penstock ordered for tbe Marys Lake and Estes projects. Darby delayed tbe fabrication of penstock to be used by plaintiff until completion of tbe Kortes penstock.
The contracting officer for tbe Darby contract determined that tbe delay in completing the 96-inch penstock for the Marys Lake power plant resulted from causes within tbe control of Darby, since it had received tbe steel for this pen-stock in August and September of 1947, but bad used it in fabricating tbe Kortes penstock.
The contracting officer for the Darby contract also found that approximately 34 percent of the steel for the Estes pen-stock was available in March 1948 but that the commencement of fabrication of this penstock was delayed until April 1948 because of continued work on the Kortes penstock. He determined, however, that Darby was unable to obtain the acceptance of any orders for steel from February 28, 1948, until January 5, 1949, by the operation of Public Law No. 395, but was finally granted priorities for 1,000 tons March 29, 1949, through the influence and efforts of the Bureau of Reclamation; that Darby had to work on an intermittent basis from April, 1948, through April, 1949, and could not resume a full-time rate until May 1949. He found production was reduced approximately 52 percent or 205 days during this 13-month period which he determined was an excusable delay.
Plaintiffs were not advised until November 1948 that there would be delays in the delivery of penstock and that their revised installation schedule could not be met.
18. Public Law 395, 80th Congress, 1st Session, December 30,1947, 61 Stat. 945, provided in part as follows:
SectioN 1. _ The purposes of this joint resolution are to aid in stabilizing the economy of the United States, to aid in curbing inflationary tendencies, to promote the orderly and equitable distribution of goods and facilities, and to aid in preventing maldistribution of goods and facilities which basically affect the cost of living or industrial production.
*693 Voluntary Agreements
SeotioN 2. (a) In order to carry out the purposes declared in Section 1 of this joint resolution, the President is authorized to consult with representatives of industry, business, and agriculture with a view to encouraging the making, by persons engaged in industry, business, and agriculture, of voluntary agreements approved by the President — ■
* * * ❖ *
(2) providing for priority allocation and inventory control of scarce commodities which basically affect the cost of living or industrial production; or
$ $ $ * $
As a result of this joint resolution, a voluntary allocation plan was set up by industries dealing in scarce commodities, including the steel industry, whereby the industry involved voluntarily set aside a part of its production and rationed it among users whose needs were considered to be most critical and whose use contributed to the stability of the national economy. The steel industry set up a Steel Products Advisory Committee. This Committee was made up of representatives of steel companies throughout the United States. This Committee set aside part of the steel production of steel companies in the United States and allotted it for distribution to users of steel where, in the judgment of the Committee, it would tend to stabilize the national economy in areas of production where there was a critical shortage of steel as an aftermath of World War II. The steel produced by these companies, above and beyond the amount set aside for allocation, was used to fill the orders of the regular customers of these companies. In the early days of this voluntary allocation of steel program, which began in 1948, only the most critical areas of shortage which were affecting the national stability and the national economy were allotted steel. For example, steel was allocated for the building of freight cars, for barges, and for tankers, but was denied to manufacturers of oil and gas pipe lines, prefabricated houses, and toys. The allocation of steel for a particular program was within the discretion of the Steel Products Advisory Committee composed of the civilian representatives of private steel com *694 panies. In the early days of this allocation program, applications for the allocation of steel were not made to the Committee by Government agencies on an agency basis. As the shortage of steel became less critical in its effect upon the national economy, this Committee became more liberal in its allocation of steel to less critical industries. Applications from Government agencies for the allocation of steel to programs being carried out for those agencies were also accepted by the Committee and acted upon. The Department of the Interior was the first Government agency to make application to this Committee on an agency basis to have steel allocated to projects of the Bureau of Eeclamation, including steel for the Darby Corporation to manufacture the penstock for this contract. The Bureau of Eeclamation had no priority for the allocation of steel over other Government agencies or private concerns under Public Law 395.
19. The defendant kept an inspector at the Darby plant to insure that fabrication of penstock conformed to the specifications and to speed up deliveries to the plaintiffs. Defendant wrote letters, sent telegrams, and made telephone calls to Darby in an effort to expedite deliveries of the penstock sections. Defendant’s engineers, as well as plaintiffs’ representatives, made personal trips to the Darby plant in efforts to speed up deliveries.
As Darby fell behind in the deliveries of penstock sections the defendant attempted to assist Darby in obtaining the necessary steel and to expedite its delivery. The assistance of other Government agencies was enlisted in an effort to help Darby obtain the scarce steel.
By letter of January 7, 1949, Darby advised the Bureau of Eeclamation that it could secure approximately 400 tons of 90-inch steel plate with delivery in time to avoid a complete shut-down of its plant, and requested authority to use this narrower plate steel, to be made up in 30 to 37-foot sections which would change the location of field welds, but with the same number of pieces so that there would be no increase in the number of welds required. It also requested approval for the spacing of supporting rings at 89 inches in place of the 96-inch space called for in its contract requirements in the straight line sections. By telegram Jan *695 uary 10, 1949, the Bureau of Reclamation approved the use of narrower steel plate, without any adjustment in the contract price as extra work.
By letter February 16, 1949, the Secretary of the Interior requested the assistance of the Secretary of Commerce in securing approval of a voluntary plan for the allocating of steel for various projects of the Bureau of Reclamation totaling 83,618 tons for delivery over a 5-month period ending September 1949. On March 24,1949, the Secretary of Commerce approved the allocation of 83,618 tons of steel for Bureau of Reclamation projects with delivery to be made during the period May to September 1949.
As a result of the allocation of steel to the Bureau of Reclamation, Darby was able to place orders for approximately 1,000 tons of plate steel for the completion of pen-stock for the Estes power plant for delivery in May and June 1949. Darby then furnished a firm schedule of deliveries of the last 115 sections of penstock from May 26 to August 15, 1949, which was performed substantially as planned. Plaintiffs were furnished this schedule of proposed deliveries April 27, 1949.
At the time of the application for an allocation of steel for the Bureau of Reclamation projects, the Secretary of the Interior was of the opinion that steel for a power plant could properly be considered as steel for a program affecting the national stability and economy. It is not established by the record that if an application had been made sooner the Committee would have allocated steel for use in the performance of the contract involved in this action. It is shown that, when such application was made in February 1949, it was promptly approved.

Penstock Delays

20. The single line 96-inch penstock for Marys Lake power plant was completely installed, except for welding, by September 13, 1948, so that delays referred to herein relate entirely to the triple-line penstock for the Estes power plant.
On June 4, 1948, the construction engineer advised the Design Unit of plaintiffs’ request to advance the delivery of penstock sections for about 525 feet from the Estes power *696 plant, so that the highway crossing over this area could be finished in the fall and backfill around the power plant could be completed. This area included sections 131 to 144. Sections 138 and 143 were not delivered until January 1949.
On August 26, 1948, the defendant wrote Darby to expedite sections 1 and 23 in each line of the Estes penstock, advising that plaintiffs would be ready to start the installation of Estes penstock within a few days. By letter September 24, 1948, Darby was again requested to expedite delivery of these sections, in the event they had not been shipped.
On September 13,1948, plaintiffs advised the construction engineer that their tentative installation schedule of March 18, 1948 was based upon the defendant’s proposed delivery schedule and that it had been revised by reason of the slow deliveries of penstock sections and that their organization setup was as small as possible to synchronize the installation with deliveries. Plaintiffs further stated that it would be necessary to shut down installation work unless anchor sections 1, 5, 14 and 23 for the upper portion of the pen-stock were received. By letter of September 24,1948, plaintiffs wrote the contracting officer requesting an extension of time because of delays in penstock deliveries and pointed out that they would expect reimbursement of any expenses caused by such delays.
By letter of October 16, 1948, the construction engineer acknowledged plaintiffs’ notice of delay in accordance with Article 9 of their contract, and stated that the Government was making every effort to expedite delivery of the penstock.
Anchor sections 5 and 23 in each line of the Estes pen-stocks were delivered about September 25,1948, and installation was commenced on section 23 about October 16, 1948, following completion of the reinforced concrete anchor. Installations from anchor sections 5 were not resumed until about November 18, 1948, because the revision of the reinforcing drawing for this anchor was not received until that date. The installation of anchors for sections 5 occurred at the access road crossing for the Estes gate structure. They were completed early in December 1948, but work on the gate structure was discontinued because the access road was cut *697 off. Sections 1 and 14 were delivered in November 1948 and, by tbe end of 1948, sections 1 to 23, inclusive, for all three lines of the Estes penstock were completed.
21. On November 18, 1948, J. K. Richardson of the Bureau of Reclamation and George Bulling of Peter Kiewit Sons’ Company visited the Darby plant and conferred with its officials with a view to expediting the delivery of pen-stock. It was determined at that time that Darby had only sufficient plate steel on hand to operate until about February 1, 1949, and that it needed about 1600 tons, of which only 100 tons were on order for delivery in February, 1949. This represented approximately 45 percent of the total steel required for the Estes penstock. Darby had on hand sufficient steel to fabricate the elbow sections for the entire job, which required installation in concrete anchors and had to be placed before intervening sections could be installed. Plaintiffs were advised by Mr. Richardson that their tentative penstock schedule revised November 11,1948 could not be met because of late deliveries.
By letter of November 27,1948, the plaintiffs again notified the construction engineer that they were being delayed by slow deliveries of penstock sections and they expected reimbursement of their additional expense and extensions of time to avoid liquidated damages. The construction engineer acknowledged the same as notice of delay required under Article 9 of the contract.
Anchor sections 138 and 143 were delivered in January, 1949 and installation of the lines from section 131 to the Estes power plant was commenced.[2]
22. By letter of February 28, 1949, plaintiffs advised the construction engineer that the installation of sections 131 to 144 would be completed about April 4th, and that, except for these sections and sections 1 to 23 installed at the upper end from the gate structure, only straight sections between 23 and 52 and part of the straight sections between 52 and 64 had been received, but that no anchor sections had been received for these portions of the lines. Plaintiffs again *698 notified the construction engineer that their costs were increased by uncertain delivery of penstock for which they expected reimbursement and extension of time sufficient to avoid liquidated damages. On March 3, 1949, the construction engineer acknowledged plaintiffs’ letter as notice of delay required under Article 9 of the contract.
On March 17, 1949, plaintiffs again complained of slow deliveries, and the construction engineer replied March 31st by reference to his letter of March 3,1949.
The sections for the Estes triple line of penstock from 24 to 67 were substantially all delivered by the end of March 1949, including the anchor sections which had to be installed first. All of the remaining elbow sections, which required concrete anchors, were received by June 4th, except some of the anchor sections 74 and 88. Upon the completion of the installation of these anchor sections the plaintiffs received the remaining straight sections for continuous installation.
23. On February 1, 1950, the contracting officer issued his findings in respect to penstock and other delays. He determined that plaintiffs were otherwise ready to commence the installation of penstock by May 1,1948, as planned, and that except for the rate and order of deliveries of penstock piping by the Government, the contractors could have completed installation of the penstock by January 31, 1949, except the coating, which, due to freezing weather, could not have been completed before May or June 1949. This determination was based upon performance of all operations during 1949, after sufficient pipe had been delivered to permit the installation without interruption. Since the installation of pen-stock could have been performed concurrently with and independently of other key items of work under Schedule III of their contract, which included the gate structures and Marys Lake spillway, the contracting officer did not grant additional time for the delay on penstock installation. The plaintiffs accepted these findings of the contracting officer.
The placing of all penstock, except closing pieces, was completed about the middle of September, 1949, but the cutting and installing of closing pieces and welding was not completed until December 17, 1949, and the mortar coating *699 around the welded girth joints was completed about December 20,1949.
The plaintiffs completed the installation of this penstock as soon after final delivery of the pipe sections as reasonably could be expected, but it appears that work could have been commenced about July 1, instead of August 1,1948, had the concrete piers in the open trench areas been ready to receive the rocker sections.
The plaintiffs were delayed approximately eight (8) months in the installation of penstock under Schedule III of their contract.
The ironworkers’ strike from March 28, 1949 to June 19, 1949 slowed down the application of the mortar coating of penstock piping, but did not substantially affect the installation of penstock on the deliveries made prior to June 1949.
24. Other Government contracts. The plaintiffs were required to coordinate their work with other Government contractors. Lowdermilk Brothers were awarded a contract for the construction of Rams Horn Tunnel, which terminated at the Marys Lake gatehouse and Prospect Mountain Tunnel, which terminated at the Estes gatehouse. The gatehouses joined the outlet portals of the respective tunnels and the upper ends of the penstock were encased in the concrete substructures of the gatehouses.
Lowdermilk Brothers were given notice to proceed April 22,1946, with a performance period of 500 days, for completion of the tunnels by September 4, 1947. The Rams Horn Tunnel was delayed for a period of 104 days and was completed December 17, 1947. The Prospect Mountain Tunnel was delayed 314 days and was completed July 14, 1948.
The concrete substructure for Marys Lake gatehouse was constructed from July 10th to October 1, 1948, and the substructure for the Estes gatehouse was started about September 22, 1948, and completed about .March 9, 1949. The concrete superstructure for Marys Lake gatehouse was constructed from November 12th to December 6, 1949, and the superstructure for Estes gatehouse was constructed from September 15th to October 26, 1949.
In his findings of February 1,1950, the contracting officer determined that plaintiffs were ready to start excavation for *700 the Estes gatehouse substructure on December 2, 1947, but were delayed until the completion of the Prospect Mountain Tunnel on July 14,1948, and accordingly found that the completion of work under Schedule III of plaintiffs’ contract was delayed 226 days for which an extension of time was allowed. The plaintiffs accepted this determination and allowance of the additional time.
The delay in the completion of these tunnels had no effect upon the installation of penstock, as planned in plaintiffs’ construction schedule.
OTHER MATERIAL SUPPLIED BT THE DEFENDANT
25. Paragraph 28 of the specifications provided that the contractor would be required to unload, haul and store all materials furnished by the Government and that this cost would be included in the unit bid prices; also that materials be stored in a manner satisfactory to the contracting officer and protected from distortion or other damages as determined by the contracting officer. Materials furnished by the Government were delivered at Loveland, Colorado, where they were taken over by the contractors.
With the exception of penstock and heavy machinery such as turbines and generators that required a considerable period of time to design and manufacture, it was not customary to order materials in advance of the award of a contract of this type, and no efforts were made to obtain the necessary materials for plaintiffs’ contract until about April, 1947.
The defendant was required to furnish all permanently installed materials embedded in concrete structures, other than reinforcing bars, consisting primarily of iron and steel pipes, pipe fittings, electrical conduits and metal sealing strips. Although the contract did not provide that these embedded materials would be supplied at specified times or in any given order, the placement of concrete could not proceed until such materials were available, together with the detail drawings showing the exact locations and the manner in which such embedded materials would be placed. The normal procedure is to schedule the delivery of materials over the period of performance specified in accordance with *701 the anticipated needs of the contractor based upon his construction schedule.
26. Paragraph 24 of the specifications required that, (1) within 30 days after receipt of notice to proceed, the contractors would furnish the contracting officer a complete construction program showing in detail the proposed program of operations providing for the orderly performance of the contract work, (2) the contracting officer would be immediately advised of any proposed changes, and (3) revised construction programs would be submitted at intervals of not more than 6 months. Notice to proceed was received by plaintiffs May 3,1947.
By letter of April 20,1947, plaintiffs advised the construction engineer of their intention to commence work on clearing the sites and the construction of temporary buildings, and transmitted their proposed construction program, with approximate performance periods as follows:
Schedule I. May 1,1947 to August 15,1949
Schedule II. September 1,1947 to July 1,1949
Schedule III. June 15,1947 to June 15,1949
Plaintiffs’ letter of transmittal stated in part:
In order to comply with the above schedule, the building and reinforcing details will be required at an early date, this would also require an early delivery of items to be installed in, or below these structures, such as, drainage pipes, electric conduits and other miscellaneous embedded materials.
í$! ^ íjj Sfc Jfi
* * * Installation of both the 78" & 96" penstocks will depend on the delivery date of this material.
Plaintiffs’ proposed construction program was acknowledged by the construction engineer by letter of June 20, 1947, which stated that it “appears in general to be possible of accomplishment.”
Thereafter plaintiffs submitted revised construction programs by letters December 22,1947, February 25,1948, September 23,1948, April 27,1949 and January 21,1950. Schedules were submitted May 16, 1947, for both electrical and plumbing installations. A schedule for the installation of *702 penstock was submitted on March 18, 1948, and revised November 11, 1948.
27. The defendant undertook to procure materials in the order that they would be needed for installation at the site. Commencing about July 4, 1947, the procurement of materials for plaintiffs’ contract was performed by the Design Division of the District Engineer’s office, Bureau of Reclamation. It consisted of sections for structural, electrical, mechanical, architectural and civil engineering. Prior to July 4, 1947, the procurement of materials was initiated in the office of the Chief Engineer.
The procurement of materials was initiated by the issuance of requisitions giving a description of the materials needed as to types, character, sizes, quantities and other data, with the dates of delivery required. Requisitions were prepared from material procurement schedules containing similar data, which in turn were based upon the contractors’ construction schedule for dates of delivery. The delivery time was designated about 30 days before such materials would be needed on the job. These requisitions were then sent to the purchasing section where materials were procured by awards of contracts on bids, direct purchases by negotiations or orders placed in the open market.
Some of the materials required the preparation of drawings for proper fabrication of exact measurements, etc., before requisitions could be prepared. Other materials, such as electric conduits and certain types of pipes, required no drawings, and could be ordered in varied lengths and sizes.
28. Prior to the award of the contract to the plaintiffs, much of the embedded material was in short supply which fact was known to the defendant. This situation continued until around the end of 1949.
In numerous instances after the award of the contract, the purchasing section of the defendant failed to receive any bids on invitations sent out for materials; other bids were not acceptable because of excessive prices, proposed substitution of materials, very late or indefinite delivery dates, or contingent prices.
Bids and other offers to furnish materials were sent to the Design Division for acceptance or rejection. Much of *703 the material was readvertised for bidding; some requisitions were broken up into smaller lots for bidding; substitutions were made, and some material was purchased that required fabrication by the Government; negotiated purchases were made by the procurement officer and purchases in the open market.
29. The Government’s resident engineer was in charge of construction under plaintiffs’ contract and was directly concerned with the delivery of Government furnished materials for use in construction. In the early stages of the contract he sent teletypes and made phone calls almost daily to the district office for materials to start the job. He employed one Bradley to act as liaison between the job and the procurement division at the district office. Bradley was so employed from May to September, 1947, until these duties were taken over by Harry B. Miller, materials control engineer, of the Design Engineer’s office.
The resident engineer was not responsible for the procurement of materials. Bradley was employed for assignment as field engineer for the Estes power plant, but because of the difficulty in obtaining pipe and other embedded materials he spent about two months contacting pipe companies in Denver for all available materials in stock and placed orders with-these companies for pipe that might come in.
The resident engineer also had prepared material take-off sheets for field use only. They were prepared from detail drawings received at the field office for each pour of concrete, and listed all the types of piping and other materials that had to be installed before the pour was made. They were prepared from two to three months in advance of the anticipated concrete placement, when drawings were received. The status of materials listed on these take-off sheets was then indicated thereon, as on hand or on order, so that efforts could be made to obtain the additional material needed. These take-off sheets were furnished plaintiffs to make certain that they would obtain the right materials for placement in the proper pours, since much of the materials consisted of special types, such as valves of different pressures and pipes of different sizes and weight for specific locations. *704 Materials in the yard were all tagged with the purchase order number for proper identification.
30. Conferences were held from time to time between plaintiffs’ representatives and Government officials for the purpose of expediting the orderly flow of materials needed in the construction. The plaintiffs also made written complaints of delays in the deliveries of materials and drawings required for their installation, and requested extension of time for such delays to avoid the assessment of liquidated damages under paragraph 23 of the specifications.
The contracting officer determined that plaintiffs were delayed for a period of 30 days in the substructure of the Estes power plant by reason of delay in the delivery of sub-drain pipes and fittings required. He found that rough excavation was completed June 28, 1947, and that fine excavation for pipe trenches could have been completed by July 15th, but was not continued because pipe was not available, and was not delivered until August 13, 1947. He also determined that the substructure concrete placing was delayed 10 days during the period from August 15,1947, when plaintiffs were ready to commence the placement, to September 9, 1947, when sealing strips were delivered to the site. Plaintiffs borrowed some sealing strips and commenced work August 26th.
The contracting officer also found that work on the Estes power plant switchyard was stopped July 1, 1949, because of contemplated changes and that plaintiffs were not authorized to resume work until December 27, 1949. Change Order No. 3 issued November 4,1949, and approved May 17, 1950, provided changes in the access road of the Estes power plant, and changes in the drainage and sewer system, water line, fire protection system and oil lines in both the Estes and Marys Lake switchyards, with estimated increases of $22,000.90 for changes in the Estes power plant access road and switchyard and $6,773.00 for changes in the Marys Lake switchyard. This change order allowed 60 days additional time for the performance of Schedule I of plaintiffs’ contract by reason of these changes, but no additional time was allowed for performance of changes under Schedule II in the Marys Lake switchyard.
*705 The contracting officer determined that plaintiffs were delayed in the performance of the Estes switchyard, in addition to the 60 days allowed to perform this work as changed, 105 days to January 13, 1950; and an additional 79 days from January 14 to April 2,1950, because much of the piping was embedded in concrete and work could not be resumed until April 3, 1950. Thus the total allowance for work stoppage on the Estes switchyard was 184 days, plus 60 days for the performance of the changes. Since the Estes power plant and Estes switchyard were involved in the same schedule of work and could be performed independently, the 40 days delay on the power plant was not added to the 244 days allowed on the switchyard.
The contracting officer also determined that plaintiffs had completed the rough excavation for Marys Lake power plant by October 17,1947, and were ready to commence the installation of pipes and concrete work, but that sufficient pipes and fittings to commence this work were not delivered until May 18, 1948, and consequently completion of the Marys Lake power plant was delayed for a period of 214 days.
The plaintiffs accepted the determination and additional time allowed by the contracting officer.[3]
31. The defendant made reasonable efforts after the award of plaintiffs’ contract to obtain the deliveries of the materials in the time and order required for installation.
DRAWINGS
32. Paragraphs 21 and 66 of the contract specifications listed 41 general drawings as part of the specifications. Paragraph 66 provided that these drawings would be “supplemented or superseded by such additional general and detail drawings as may be necessary or desirable as the work progresses.”
*706 Paragraph 58 of the specifications provided in part:
58. Reinforcing bars and, fabric. Steel reinforcement bars and steel reinforcement fabric shall be placed in the concrete wherever shown on the drawings or where directed. The reinforcement bars and fabric shall be furnished by the contractors. Reinforcement drawings made to show bar and fabric placement details and bar bending details and reinforcement lists which will give the information necessary for cutting, bending, and placing the reinforcement bars will be furnished at a later date with the detail drawings. As these detail drawings may not be available at a sufficiently early date to enable the contractor to purchase reinforcement bars prefabricated in the shop, it may be necessary for the contractor to purchase the bars in stock lengths and cut and bend the bars on the job. * * *
The plaintiffs ordered most of their reinforcing bars prefabricated by the supplier, because their supplier was regularly engaged in performing this work and had facilities for this purpose. The supplier normally required an advance notice of 30 days to deliver specially fabricated reinforcing steel.
33. The Design Division was established by defendant about July 4,1947 to take over the preparation of drawings and the procurement of materials, which duties had been previously handled by the office of the Chief Engineer. It consisted of sections for structural, electrical, mechanical, architectural and civil engineering. The chief of each of these sections prepared a list of the detail drawings which were deemed necessary to meet the terms of the contract.
Approximately 2,500 detail drawings were prepared for all installations under plaintiffs’ contract. A substantial number of these drawings were required for the placing of embedded material and concrete in the power plants. There were approximately 70 pours, with designated construction joints, in the Estes power plant substructure and 16 pours in the Marys Lake substructure, each of which required an average of about 14 drawings. A maximum of 23 drawings was required for some of those in the Estes substruc *707 ture. It appears, however, that some of the drawings were adaptable for use in a number of pours of similar size and relationship to the work involved. The Estes power plant superstructure required approximately 38 pours and Marys Lake superstructure only 8 pours, and these pours required an average of only about 5 and 4 drawings, respectively.
Most of the detail drawings were revised a number of times. For example, reinforcement drawing No. 245-D-4009 for Marys Lake substructure line walls of the power plant was first delivered to plaintiffs July 31, 1947. It was revised nine times and each of the revisions was delivered to plaintiffs during the period from November 13, 1947 to December 30, 1948. Many of the revisions were of minor consequence and did not affect the installation of embedded materials or the placement of concrete, and in a few instances the revised drawings were not even delivered to the plaintiffs. Some pours were made on preliminary sketches of detail drawings before such drawings were delivered.
Plaintiffs were authorized to proceed with a particular phase of the work upon the delivery of any detail drawing, provided other necessary drawings and materials were also available for such concrete placement, and any change in the drawing beyond the scope of the contract work, or the original drawing, would be paid for on the basis of authorized changes. There were often long periods between the delivery of certain drawings and the actual placement of the concrete, but it was necessary to have the drawings and all embedded materials for any particular pour before it could be placed. Until the work was actually commenced the defendant could and did make numerous revisions in detail drawings, superseding earlier drawings delivered to plaintiffs.
Some of the detail drawings were delayed in their preparation by the late receipt of shop drawings from fabricators of machinery and electrical equipment not relating to plaintiffs’ work. These shop drawings were generally nec *708 essary as a basis for preparing drawings of tbe design of appurtenances for placing of such equipment and for making proper connections with other installations.
34. The plaintiffs’ representatives first called at the Denver office of the Bureau of Reclamation and conferred with officials there June 20, 1947, for the purpose of expediting drawings and material. A number of conferences were held thereafter in an attempt to expedite drawings and have them available when required for the orderly progress of the work as planned. Numerous written complaints were made by plaintiffs of delays incident to their failure to receive the necessary drawings when needed.
Pursuant to a conference with the plaintiffs’ representatives on November 5, 1948, the chief of the Design Division submitted a memorandum to the construction engineer, listing about 76 drawings for the remaining contract work, with dates of proposed delivery up to May 1, 1949. This schedule was prepared in the order of delivery requested by plaintiffs, and the design engineer endeavored to make deliveries of drawings to meet their needs.
By letter of October 11,1949, plaintiffs transmitted to the contracting officer claims for delays to June 30, 1949, and extensions of time on account of such delays. This claim included 279 days of delay on the Estes power plant substructure for the period December 3, 1947 to September 8, 1948, by reason of delays in the receipt of necessary drawings ; 203 days delay in the construction of the Estes power plant superstructure, from September 9, 1948, to April 1, 1949, because of the late delivery of drawings and the impracticability of starting the concrete work during the winter months; and 220 days delay on the substructure of Marys Lake power plant for the period October 18,1947 to May 28, 1948, by reason of failure to receive the necessary detail drawings from the Government.
In his findings of fact February 1, 1950, the contracting officer did not consider delays on account of late delivery of drawings furnished by the Government, but only considered *709 delays due to late delivery of Government-furnished materials and late completion of adjacent work by another contractor.
The contracting officer determined that plaintiffs were delayed 214 days on the construction of Marys Lake power plant for the period October 18,1947 to May 18,1948. This period was concurrent with and substantially the same as that claimed by plaintiffs for late delivery of drawings.
The contracting officer also determined that plaintiffs were delayed 184 days on account of work stoppage on the Estes power plant switchyard during the period October 1, 1949 to April 2,1950, in addition to 60 days allowed for the performance of changes involved. The time thus allowed, plus 86 days on account of the ironworkers strike and 34 days on account of a strike by laborers, was an adequate extension of time to avoid the assessment of liquidated damages for the performance of schedule without consideration of delays attributable to drawings.
35. The plaintiffs were unable to produce the particular drawings complained of, nor furnish the numbers for identification. However, the defendant produced lists of approximately 90 detail drawings relating to structures for the Estes power plant and the Marys Lake power plant, with dates of the delivery to plaintiffs of the original drawings and revisions thereof. A summary of these lists is included herein as Table I, showing the earliest and latest deliveries of such drawings by groups.
Although it is not possible to determine an exact period of delay in the overall performance of the contract resulting from the late delivery of detail drawings, it is reasonable to conclude from the evidence adduced that delays in plaintiffs’ work were attributable, at least fifty percent of the time, to the late delivery of detail drawings, and that these delays disrupted plaintiffs’ plan of construction and the normal sequence of installing embedded materials and the placing of concrete.

*710

*711 INADEQUATE EQUIPMENT, LACK OF MATERIALS TO BE SUPPLIED BT THE PLAINTIFFS, AND INSUFFICIENT EXPERIENCED PERSONNEL
36. The plaintiffs maintained a concrete batching plant at each of the Marys Lake and Estes construction areas. They were approximately 5 miles apart. Plaintiffs employed one set of concrete mixing and placing facilities in placing concrete in both areas for all three schedules of the contract work, which limited the placing of concrete to one place at any one time. The principal units consisted of a two cubic yard “Mixermobile” and a truck crane with an Imsley bucket, both mobile units. Plaintiffs also employed wooden chutes and wheelbarrows in placing concrete in the lower areas of the Estes power plant substructure. This type of equipment was commonly employed in small inaccessible areas. The mobile mixing and placing equipment was particularly adaptable in placing concrete over widespread areas where volume of production was not the prime factor.
In the early stages of performance the mixing and placing equipment was found inadequate and failed in some instances to perform satisfactorily. The mixer unit was manufactured in 1942 or 1943, and was well worn from use. Its water measuring device did not function properly and was replaced. About 156 cubic yards of concrete were placed with this equipment in August 1947. The plaintiffs purchased a new model from the same manufacturer which was delivered, tested and put into operation the first week of September 1947. The crane delivery bucket did not function satisfactorily in that it failed to readily release the concrete. Wooden chutes were constructed for each placement of concrete, and sometimes broke down. On May 7, 1948, the chute support collapsed, and it was not used for the last few feet of the pour then in progress, which necessitated excessive shoveling of concrete to complete the pour. The wooden chutes were inefficient and unsatisfactory because of excessive handling of the concrete required and plaintiffs found it necessary and desirable to discontinue their use. Plaintiffs later provided a new delivery bucket, concrete hoppers, elephant trunks and regular concrete bug *712 gies for placing concrete, which, was satisfactory. Except in the construction of the power plants the concrete placements under plaintiffs’ contract were spread oyer wide areas, and the actual placement required a relatively small portion of the time in comparison with the work involved in constructing and aligning forms and placing the reinforcement bars and embedded materials.
37. The defendant contends that plaintiffs had employed six different carpenter superintendents during the first year and that it was not until the spring of 1948, when a Mr. Hoover was employed, that capable supervision and good progress was attained, and that this situation delayed the progress of performance in the early stages, especially in the amount of concrete that could be placed.
Plaintiffs’ first carpenter superintendent, Ben Ecklund, was an experienced superintendent and was employed for the first season from May to November 1947. He did not elect to return because of family residence in Omaha. Mr. Hoover was a very good superintendent and was employed during the 1948 season, when the greatest volume of concrete was placed, and for a short period in 1949. During the winter season of 1947-1948, a Mr. Peterson was superintendent for a time and otherwise continued in the plaintiffs’ employment throughout most of the job performance. A Mr. Davis, who followed Peterson as superintendent, was transferred to another project and continued in plaintiffs’ employment. A Mr. Lindyfield, who was employed for only about three weeks in the spring of 1948, returned to Sweden where his family resided. The evidence indicates that changes in carpenter superintendents were made for reasons other than inexperience or inability to perform a satisfactory job.
Peter Kiewit Sons Company was awarded a contract February 9, 1950, to be completed by November 8,1950, for the construction of a 10-foot concrete conduit, 2,000 feet in length, known as the Olympus siphon, which was located approximately 1% to 2 miles from the Estes area and 7 miles from Marys Lake construction area. The same general superintendent and other supervisory personnel, and much of the same equipment and the same crews, were employed on *713 the Olympus siphon job as were employed on plaintiffs’ contract. Defendant’s representatives at the site never complained of this practice, nor is there evidence which establishes an insufficiency of personnel on the Estes or Marys Lake projects resulting from the use of certain employees on the Olympus siphon job from time to time during the 1950 season.
38. The plaintiffs generally used plywood in the construction of concrete forms but also employed tongue and groove where plywood was not suitable. Heavier timbers were also required for form construction, bracing, staging and ramps.
Prior to the arrival of carpenter superintendent Hoover on the job in the spring of 1948, plaintiffs were short of lumber necessary to properly perform the work, and the resident engineer made numerous oral complaints to plaintiffs’ general superintendent in this regard. During 1947 plaintiffs’ concrete form work was limited to the Estes power plant, where only 21 pours were completed. The placing of concrete work in this area was delayed 40 days by lack of materials to be furnished by the Government and also restricted by the delivery of detail drawings. No concrete work could be performed on the Marys Lake power plant because sufficient embedded materials and drawings had not been received. It is not possible from the record to determine any delay which may have resulted from a shortage of lumber.
It is customary to use forms as long as they remain suitable but, during the placing of concrete, many of them were used to such an extent that they had a tendency to peel, crack and check. This resulted in unsatisfactory concrete finish and many such forms were condemned and their use discontinued. Upon his arrival on the job, Mr. Hoover placed a large order for lumber, and thereafter the form work progressed in a satisfactory manner. One side of the wall forms for the Estes substructure were constructed and made ready in advance of the receipt of detail drawings and embedded materials. As soon as these materials were installed the other side of the form could be erected and the pour could be completed more rapidly. This practice continued for the remaining construction period.
*714 Formwork constructed in this manner tied up forms for long periods of time. At times the forms were erected around an entire structure and remained for a considerable period of time before the installation of embedded materials could be completed or all drawings received for the placing of concrete. This practice resulted in the deterioration of the forms and the use of an excessive amount of form lumber.
The curved walls of the Marys Lake spillway required the use of Masonite in forming the concrete to obtain a smooth surface. On two of the curved wall placements, plaintiffs employed a number of pieces whereas they could have used two large sheets. Comparatively, in these instances, it required ten man-hours to complete the one form and six man-hours for the other. The resident engineer estimated that the installation of a Masonite form of this type probably should have been performed in two man-hours.
In another instance a pipe fitting was damaged on the job, which required considerable time to replace, and this would have held up that particular pour if the materials and drawings had been otherwise available. While hoisting a Government overhead crane for installation, one of plaintiffs’ cranes tipped over and damaged plaintiffs’ crane and some of the concrete which had to be repaired.
39. Neither the resident engineer nor the office engineer at the Estes Park field office made any written complaint of any nature to the construction engineer or the plaintiffs in respect to plaintiffs’ equipment or personnel. None of the concrete placed by the equipment and methods employed by plaintiffs was rejected.
The original findings of fact in respect to delays were prepared by the field office engineer at Estes Park, and finally issued by the contracting officer in Denver. None of the delays by the plaintiffs in the contract performance was attributed to a lack of manpower, equipment, material to be furnished by plaintiffs or inexperienced personnel. Delays allowed for the purpose of extending the contract time were those deemed to be without fault or negligence of the contractors and delays affecting small parts of the job which were concurrent with delays attributed to the Government were not included in the contracting officer’s findings.
*715 The delays attributable to the plaintiffs in this category were minor and did not materially affect the overall performance of the contract.
DAMAGES
40. Penstock installations. The plaintiffs claim $41,665.98 increased cost of installing penstock. This claim consists of the following items:
(a) The plaintiffs rented a transformer with the necessary electrical equipment for the operation of their electric welding equipment, and it was used solely for this purpose. They paid $1,500 for the entire period of approximately 17 months, or an average of $88.23 per month. Plaintiffs’ increased rental cost of this unit was $705.84.
(b) The plaintiffs subcontracted with the N-ray Engineering Company to radiograph all girth joints of penstock welded in the field at $1.50 per foot of weld, with a minimum charge of $400 a week, and a move-in fee of $500. The plaintiffs paid the subcontractor $22,003.20 exclusive of the moving fee. The subcontractor X-rayed 9,371.5 lineal feet of welded joints, including retests, which, at $1.50 per foot Avould have cost plaintiffs $14,059.25. Plaintiffs claim the difference of $7,945.95.
The increased costs of $7,945.95, computed on a unit basis, is equivalent to approximately 20 weeks of delay over the entire period of this work at the minimum charge of $400 per week, and fairly represents increased costs to plaintiffs.
(c) Plaintiffs claim $10,972.17 as excess labor costs, consisting of $9,763.89 of direct labor and $1,208.28 of payroll insurance and taxes on labor at 12.375%. This claim is based upon total labor costs of $24,917.91 for the period July 23, 1948, to September 14, 1949, as compared with $15,154.02, claimed normal labor costs at the unit rate of $35.91 for 422 sections installed during that period. Plaintiffs’ labor costs for the period July 23,1948 to June 14,1949 were $14,682.97, and during this period 137 sections of pen-stock pipe were installed at a unit cost of $107.17. During the period June 15 to September 14, 1949, the labor costs were $10,234.94, and 285 sections of pipe were installed at a unit cost of $35.91. Plaintiffs contend that the unit labor *716 cost of $35.91 represents the normal labor of performance after penstock sections were delivered in sufficient quantity for continuous operations.
Plaintiffs’ unit labor cost of $35.91 for work applied upon the installation of 285 sections during the period June 15 to September 14, 1949 is not a proper measure of normal labor costs. The 137 pieces of penstock installed prior to June 15, 1949 included the 18 sections of 96-inch penstock for Marys Lake power plant, 69 pieces of the upper end of the Estes 78-inch penstock, 42 pieces of the lower end of the Estes penstock, and 18 additional sections, which obviously represented anchor sections, since these had to be installed before intermediate sections could be placed. It appears that these pieces included all of the sections which had to be encased in concrete, and all sections connecting the gatehouse substructures and those leading into the power plants which would require greater labor costs to install.
Although only 137 sections were installed prior to June 15, 1949, there were actually delivered up to June 4, 1949 about 335 sections, including all but a few anchor sections. As soon as the pieces were received they were taken to a large flat area east of the Estes power plant where the reinforced mortar coating was applied and, after about 10 days of curing, were again delivered to their respective locations in the Estes penstock lines ready for installation. These pieces could not be installed in the order received because of missing anchor sections or other pieces required for continuous installation from such anchor sections.
Approximately 28 closing sections, which had to be cut, beveled and made up in the field to fit the closure between each anchor section, were not included in the installations from June 15 to September 15,1949, but were installed later. The welding of installations after June 14, 1949 was continued until about the middle of December 1949. There is no evidence of the additional cost of welding penstock that were installed in place up to September 14,1949, nor any of the additional costs of installation after September 14th.
The contract specifications provided that the mortar coating, welding and painting would be included in the price of installing penstock, but that concrete for penstock and *717 anchors would be paid separately. There is no satisfactory explanation of how plaintiffs classified their direct labor for the installation of penstock.
Although plaintiffs were required to perform the work incident to the installation of penstock on a reduced basis prior to June 1949, and had to move their operations from place to place along the line to utilize the penstock sections in the order they were received, there is no adequate evidence showing the increased labor costs resulting from these installations.
(d) Plaintiffs claim $1,908.70 as increased cost of equipment rental for the installation of 422 sections of the pen-stock. This was computed as in item (c) above. " Equipment costs, as classified in plaintiffs’ daily rental sheets for installation of penstock, amounted to $31.44 for each of 137 sections installed prior to June 15, 1949, and $17.52 per unit for 285 sections installed from June 15 to September 14,1949. No description of the equipment was furnished in evidence, nor was there any explanation given of the manner it was utilized in the installation, as distinguished from other phases of the penstock work.
The unit cost of $17.52 per section during the period June 15 to September 14, 1949 does not establish a normal or reasonable cost expectancy for reasons reported under item (c). In addition, all of the sections installed during 1949 were placed in trenches and were mortar coated, and because of their weight were handled by a No. 95 Northwest crane, instead of a No. 6 crane that was used to install Marys Lake penstock and the upper sections of the Estes penstock installed in 1948. The rental expense of this Northwest crane is included in item (g) below. The evidence submitted is insufficient for a determination of the plaintiffs’ increased equipment rental costs for other equipment used in the installation of penstock.[4]
*718 (e) The plaintiffs rented a Jaegar air compressor from the Gunderson-Taylor Machinery Company August 4,1949, for use in connection with the installation and backfilling of penstock from that date until December 16, 1949, at a cost of $741.61. The plaintiffs had a number of compressors on the job which were adequate for normal performance, but because of the delay in the delivery of pen-stock until 1949, and the accumulated work over the entire area, requiring the use of the compressors for the operation of automatic tools on the gate structures, the power plants and backfilling, an additional compressor was deemed necessary to complete the penstock work.
It is reasonable to conclude that the rental of this additional compressor for use on penstock installation resulted from the delay in delivery of penstock sections by the defendant.
(f) Plaintiffs employed one George A. Nelson to supervise the installation of penstocks, for which he was especially qualified and experienced. He was paid a weekly salary of $138 plus $50 per month living allowance, equivalent to $648 per month, from July 5,1948, until all penstock had been completed. By reason of the delay of eight months in the delivery of penstock, plaintiffs’ supervision cost for this work was increased in the sum of $5,184.
(g) Plaintiffs employed a No. 95 Northwest Crane to handle the heavy pieces of penstock and place them in the trenches. It was brought to the job about July 15, 1948, and was not removed from the site until September 19,1949, when all the penstock was in place, except the closing sections which were about 7.5 feet in length. This crane was not required for other contract work. Neither was it employed in placing the sections of Marys Lake penstock nor the first 23 sections of the triple-line of penstock for the Estes power plant, because plaintiffs had another machine of adequate capacity to handle these sections and the No. 95 Crane was too large to negotiate the steep grades. Except for the delays in- delivery of the penstock sections, the maximum calendar period, during which this crane would have been re *719 quired on the job, was six months. It was actually used about four and one-half months.
This large crane was charged to the job costs at $1,438 per month as ownership rental expense. Its value was not put in evidence. It was not practical to move this unit on and off the job as required because of the expense of moving, assembling and disassembling it. The plaintiffs’ rental charges were less than the Associated General Contractor’s monthly ownership expense rates for similar units, on normal usage of seven or eight months a year.
Since this unit was not employed during the eight months of delay on account of delays in the delivery of penstocks, nor subject to normal wear and tear, a reasonable ownership rental expense is $719 per month, or $5,752 for the period of delay attributable to the defendant.
(h) Plaintiffs were required to employ experienced welders of special skill for welding the girth joints of the penstock in the field. They were classified as boilermakers, and were paid $2.15 per hour. On April 18, 1949, plaintiffs were required to increase the rate of boilermakers’ pay to $2.25 per hour, and on October 16, 1949, it was further increased to $2,375 per hour.
During the period from April 18 to December 18, 1949, while they were engaged in welding penstock, the boilermakers were paid increased pay of $2,716.58, plus payroll taxes and insurance of $280.30, at the applicable rate of 10.318 percent. Plaintiffs were reimbursed 65 percent of the increase in actual wages amounting to $1,765.78 under the escalator clause of paragraph 19 of the specifications. This increase occurred after all welding of penstock should, under normal circumstances, have been completed and is deemed to be wholly attributable to the delay in the delivery of penstock piping by the defendant. Plaintiffs’ unre-covered costs amounted to $1,231.10.
Plaintiffs’ increased costs of penstock installations, reasonably attributable to the delays in delivery of the sectional parts by the defendant, were $21,560.50, summarized as follows:
*720 (a) Rental of transformer_ $705.84
(b) X-ray of all field welds_ 7,945.95
(e)Direct labor on installations_ 0
(d) Equipment rentals on installations_ 0
(e) Rental of additional air compressor_ 741.61
(f) Superintendent of penstock installations_ 5,184.00
(g) Employment of Northwest crane No. 95_ 5,752.00
(h) Increased • pay of boilermakers_ 1,231.10
Total_ 21, 560. 50
41. General performance. Plaintiffs’ general claim consists largely of job overhead costs of a continuing nature which were incurred on contract performance from January 13, 1950. Plaintiffs finally completed all schedules of the contract work October 18, 1950, or 364 days after its scheduled completion. The ironworkers’ strike, which occurred during the original performance period from March to June 1949, delayed all schedules of work approximately 86 days, which extended the completion date to January 13,1950. Schedule 1 of the work was extended 60 days for the performance of changes in the Estes switchyard, but this was substantially offset in the same schedule by 40 days of delay on account of late deliveries of materials and an indeterminate period of delay on account of late delivery of drawings for the construction of the Estes power plant. It is reasonable to conclude that plaintiffs’ job overhead expense after January 13, 1950 was not greater than the average rate over the entire performance period.
(a) The plaintiffs’ job overhead expense after January 13, 1950 consisted of the following classifications and amounts:
Supervisory and office personnel_$41,127.42
Payroll taxes and insurance_ 3,070. 60
Two pick-up service trucks and one automobile_ 1,851.68
Telephone and telegraph expense_ 1,142. 59
Office supplies, printing and stationery_ 330. 54
Postage and box rental_ 103. 60
Total_ 47, 626.43
(b) Plaintiffs were required to protect concrete against cold weather until cured. Except for the delays attributable herein to the Government, plaintiffs’ work would have been *721 advanced to the degree that no additional concrete would have been poured after cold weather commenced in the fall of 1949. During the period from October 9, 1949 to April 23, 1950, plaintiffs incurred costs for protecting concrete work, consisting of labor, fuel oil, heaters and supplies of $15,494.95.
(c) In addition to the pick-up trucks and automobile expense claimed under item (a) above, plaintiffs employed a substantial amount of their operating equipment on the job after January 13, 1950, bo complete performance. The plaintiffs claim rental expense on this equipment for the actual time that each unit of equipment was required for additional use after January 13, 1950. The expense of this equipment was based upon rental schedules of Peter Kiewit Sons Company, on a monthly basis, which rates are considered to be reasonable for ownership expense of such equipment. The average monthly rental for all such equipment employed was $7,764.00. A number of the larger units were only required on the job for short periods. Included in this group were the Northwest No. 6 shovel at a monthly rate of $1,019, required on the job 2.37 months, two tractors for 3.5 months, two Euclid dump trucks 3.07 months, a Lorain motor crane 3.3 months and the Mixermobile 5.13 months. The total rental expense of this equipment was $32,992.94.
(d) The plaintiffs also rented from Peter Kiewit Sons Company additional equipment which was required from time to time after January 13, 1950. It was transferred from the Olympus siphon job and was rented only as needed. Rental paid for this additional equipment was $10,682.42.[5]
(e) Plaintiffs rented a one and one-half cubic yard shovel from August 11 to September 7, 1948, and four days in March 1949, at a cost of $1,968.28. It was required for the rough excavation and backfill at the Estes gate structure. Plaintiffs contend that this rough excavation would have been performed with its No. 6 Northwest shovel during the early period of performance when its equipment was avail *722 able, except for the delay in completing the Prospect Mountain Tunnel until July 1948. When this excavation was commenced plaintiifs’ No. 6 shovel was then employed in placing the Marys Lake penstock, and it was necessary to rent the additional equipment. However, since plaintiffs claim all equipment expense for the delay periods as extended beyond January 13,1950, it would be unreasonable to allow the additional interim expense for the same delay during earlier periods.
(f) By reason of the delay in completing its contract, plaintiffs were required to extend their insurance policies and fidelity bond to October 1950. The additional cost of these premiums was $2,189.63.
(g) The plaintiffs incurred additional expense of $5,082.37 for overtime premium pay during the period September 5 to November 13,1949, in order to enclose the Marys Lake and Estes power plants and the Estes and Marys Lake gate structures and to bring them to such completion that other contractors might pi’oceed with installation of machinery and other equipment.
In order to coordinate the activities of other contractors with plaintiffs’ work, they were requested by the construction engineer to furnish proposed pour schedules for the Estes power plant superstructure and the Marys Lake power plant, using realistic dates. Such schedules were furnished for these structures on June 24th and July 12, 1949, respectively. Monthly follow-up letters were written by the construction engineer until November 1949. The Estes power plant superstructure pours were completed October 15,1949, or six days ahead of schedule.[6]
The construction engineer’s letter of August 31, 1949, in reference to Marys Lake power plant, contained the following note:
Work is approximately two weeks behind schedule; and if some means for accelerating the work is not put into effect, the roof of the power plant will not be constructed at the end of the regular construction season.
*723 By letter of September 28, 1949, the construction engineer wrote plaintiffs in respect to Marys Lake power plant:
Work is not progressing satisfactorily according to schedule. You have stated that, if necessary, you would employ three shifts in order to meet schedule. At the present time, very little is being done on the second shift. It is again requested that such means be used as will insure the completion of the pour schedule before cold weather creates a hardship.
By letter of November 5, 1949, the construction engineer wrote plaintiffs as follows:
At a recent meeting held in this office, attended by your representatives and employees of the Bureau, the following conservative schedule was prepared for the installation of the embedded parts of machinery in Marys Lake and Estes Power Plants. Every means possible should be employed to complete items ahead of this schedule in order that contractors following may also complete their schedules within their contract times. This can be accomplished only by full cooperation of all concerned.
The Marys Lake power plant, including the roof slab, was completed by November 8,1949, or two days ahead of plaintiffs’ proposed schedule of July 12, 1949. It is reasonable to conclude that the overtime premium pay incurred on the foregoing work was attributable to the delays on the part of the defendant in late delivery of materials and drawings, and to comply with the requests of the construction engineer.
(h) In addition to the increased rates of pay to boilermakers, reported in finding 40 (h), the plaintiffs were required to increase rates of pay for certain groups of their employees in June 1950 and for others in September 1950. Plaintiffs were paid 65 percent of the actual wage increases under paragraph 19 of the specifications. Plaintiffs’ unre-covered payments for increases, other than boilermakers, during the period of performance after January 18, 1950, were $687.69.
(1) Plaintiffs were required to dewater and keep the power plants dry throughout construction from the time excavation was completed. The excavation of the Estes power *724 plant was completed on or before September 1, 1947. The pumping expense for both plants to September 1, 1950 was $11,300.75, or approximately $10.82 per calendar day. Plaintiffs’ claim for dewatering expense for 311 days from October 24, 1949 to September 1, 1950 is in the sum of $1,780.92. This is an average of $5.73 per calendar day. The plaintiffs’ dewatering expense from January 13, 1950 to September 1,1950 was $1,303.07.[7]
The plaintiffs’ increased costs for job overhead and other expense attributable to delays reported herein were $116,059.50, summarized as follows:
(a) Supervision, office expense and. service vehicles_$47, 626.43
(b) Cost of protecting concrete work 1949-1950 winter season - 15,494. 95
(c) Equipment ownership expense_ 32, 992. 94
(d) Equipment rented from Peter Kiewit Sons Company__ 10,682.42
(e) Equipment rented from others_ 0
(f) Bond and insurance premium expense_ 2,189.63
(g) Overtime premium pay_ 5, 082.37
(h) Pay increase expense, other than boilermakers’ increases paid_ 687. 69
(i) Dewatering of power plants expense_ 1,303.07
Total- 116, 059. 50
42. Concrete placements. Plaintiffs claim $101,077 for placing 8 items of concrete under their contract, after credits of $15,495 for winter protection and $5,082 for overtime premium pay, which amounts were included in their general claim. Plaintiffs’ contract included some 18 items of volume concrete estimated at 17,090 cubic yards which, at the unit bid prices, amounted to $793,540, in addition to other items of concrete work for bonded floors, sidewalks, curbs and gutters. Certain items relating to concrete were paid for under other items of the contract schedule, such as the furnishing and handling of cement, furnishing and installing reinforcing bars, and the installation of pipes and other embedded materials.
*725 Plaintiffs’ concrete claim is based upon monthly field cost reports. These cost reports included costs for each item of performance during the period with the estimated quantity of concrete placed under each item. Plaintiffs used one or more of these field cost reports as a “yardstick” measure of the normal unit cost for each of the concrete items involved in their claim, and applied this rate to the total yardage placed. The difference between the amount so determined for each item and the total costs for each of these concrete items is presented and claimed as increased costs.
The eight items, on which increased costs are claimed, total 14,884 cubic yards. The total field costs for these items were $673,956, and consisted of $492,965 (or 73%) for labor, $31,061 (or 5%) for equipment employed and approximately $149,930 (or 22%) for materials. Plaintiffs added to these field costs $73,338 (or 10.882%) as indirect expense and $43,124 (or 6.4%) for additional equipment expense, and deducted $26,926 for the recovery of labor increases under paragraph 19 of the specifications amounting to 5.462 percent of field direct labor. The unit costs and total costs were determined in the manner described above.
There were substantial variations in the cost of placing of concrete in each of the items involved, when considered on the mass or volume placed, depending upon the amount of embedded materials involved and the size and intricacies of the forms required. Much of it was placed in difficult and almost inaccessible areas. The actual pouring of the concrete required a relatively minor portion of the time involved, especially where volume was not large. Most of the time of workers was involved in the preparation and alignment of forms, checking measurements, placing reinforcing steel and installation of embedded piping and other materials. Plaintiffs have furnished no information in respect to the labor which would be properly allocable to the various classifications of work paid under separate items in the contract, other than concrete.
Without consideration of the indirect costs applied to concrete, the variations in field costs in respect to the items involved in plaintiffs’ claim are tabulated below:

*726
Pwymenrt Field costs per cubic yard items Concrete placements Minimum Maximum

23 Estes power plant substructure_$1. 81 $140. 50
24 Estes power plant superstructure_ 13. 02 149. 37
28 Estes switchyard foundation_ 11.95 120.615
29 Estes switchyard tunnel_ . 05 67.85
83 Marys Lake power plant substructure_ 1. 50 831.80
84 Marys Lake power plant superstructure_ 66.32 137.07
133 Estes and Marys Lake gatehouse substructures, spillway, and penstock anchors and walls__ 3.985 211.80
134 Gatehouse superstructures_ 3.14 168.24
While substantial variations in unit costs based upon volume placed would normally occur, variations such as those above listed must necessarily result largely from erroneous field reports of costs or volume placed, or both. For example, eleven of the reports on costs for item No. 23 total $4,978.87, whereas no amount of concrete was reportedly placed, but report No. 20 for the month of December 1948 reported 210 cubic yards of concrete placed, with costs credited for that period of $978.76. Also ten of the field reports on item 24 contain no concrete placed, but the costs reported totaled $11,452.56 in these reports.
Some form work was performed for long periods in advance of the placing of concrete, which might require additional form lumber and tend to permit deterioration. However, this was due to the delay in placing reinforcing steel and other embedded materials for which labor and other costs were properly chargeable in accordance with the contract payment schedule. They are not concrete costs under plaintiffs’ contract schedule. The evidence does not indicate in what manner the plaintiffs classified these costs. By comparing plaintiffs’ unit costs allocated to the respective claim items for concrete with the unit prices under its contract payment schedule a loss of $5,094.48 results. But there is no evidence that plaintiffs’ cost allocations followed the respective contract items with unit prices for the determination of amounts payable under such items.
In any event the delays in the delivery of materials were attributable to piping and other embedded materials, and *727 not to sand and coarse gravel for concrete work. The only drawings applicable to concrete would be the dimensional drawings, other drawings related to the bending and placing of reinforcing steel, and other embedded materials. No claim is made for any of the direct costs for the placing of reinforcing steel nor for the installation of piping and other embedded materials, all of which preceded the placing of concrete.
Although plaintiffs’ concrete work was not always performed in the usual manner, or in the sequence planned, the increased cost of placing concrete, if any, cannot be accurately determined by the method proposed by the plaintiffs, or the evidence of record.
It is found that plaintiffs have not proved increased costs in connection with the pouring of concrete. They did have some increased costs in the construction of the concrete power plants and other concrete work as such. It is considered that these increased costs have been determined and included in plaintiffs’ general claim.
43. The plaintiffs’ increased costs on contract items complained of, attributable to delays on the part of the defendant, are determined to be $137,620.00 and consist of $21,560.50 for the installation of penstock and $116,059.50 for job overhead and other items of cost resulting from these delays as shown in findings 40 and 41.
Of these costs, the $21,560.50 relating to penstock, and one-half of the $116,059.50 for job overhead and other items of cost resulting from the late delivery of detail drawings were occasioned by the Government’s breaches of the contract.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover in the sum of $79,590.25.

 The schedules of work covered by plaintiffs’ contract were originally advertised for bidding July 30, 1946, with other work schedules on the Colorado-Big Thompson Project, but all bids were rejected because they were substantially higher than- Government estimates. They were again advertised for opening of bids January 15, 1947, when bids on these schedules were again rejected. A third offer to prospective bidders was made on February 20, 1947, at which time plaintiffs were the low bidders, and were awarded the contract.

 It will be noted that up to the end of February, 1949, no anchor sections had been received, except those Installed! In the completed lines Nos. 1 to 28, and those in process of installation at the bottom of the lines from Nos. 131 to 144 at the power plant.

 Since plaintiffs Rave accepted findings of the contracting officer, on material delays and "work stoppage, it does not appear necessary to show in what respect each part of the work was affected, and, in. fact, this is not possible from the evidence. By allowing delays in the switchyard, the time was also extended for Estes power plant, and slowing down of the work there did not require allowance of additional time.

 Plaintiffs failed to submit adequate proof of similarity of work performed with equipment for the installation of penstock prior to June 15, 1949, as compared with its use thereafter. The handling of all underground sections employed the use of the large No. 95 NW crane, and the handling of all Marys Lake and upper sections 1-23 of Estes penstock was by a smaller No. 6 crane. Accordingly, it is concluded that no helpful comparison of equipment, other than the No. 95 crane which is claimed separately, is possible.

 Above rental expense Is for equipment actually employed, and used after Jan. 13, 1950, and does not represent Idle equipment kept on job for later use, as in the case of the heavy No. 95 Crane, held to handle the heavier pieces of penstock. (Finding 40 (g).)

 The aluminum windows for the power plants were not delivered to the plaintiffs until October 11, 1949.

 This pumping expense is in the nature of indirect or overhead expense, in that it is not a part of the construction. Since plaintiffs did not elect to average their overhead over the entire period, dewatering expense is found only for the period on which claim is based.